CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, Highlands Insurance Company (UK), Ltd., and London & Edinburgh General Insurance Company, Ltd., Petitioners,

v.

ARGONAUT INSURANCE COMPANY, a California corporation, Respondent.

No. C–03–1100 EMC.

United States District Court, N.D. California.

May 13, 2003.

Kathryn C. Ashton, W. Andrew Miller, Max H. Stern, Peter J. Whalen, Hancock Rothert & Bunshoft LLP, San Francisco, CA, for Petitioners.

Renee C. Callantine, Susan M. Popik, Chapman Popik & White LLP, San Francisco, CA, Mitchell A. Orpett, H. Wesley Sunu, Kevin A. Titus, Tribler Orpett & Crone, P.C., Chicago, IL, for Respondent.

## ORDER DENYING MOTION TO DISQUALIFY THE UMPIRE, CONFIRMING INTERIM ARBITRATION ORDER NO. 2, AND VACATING INTERIM ARBITRATION ORDER NO. 3 (Docket Nos. 5, 10, 25, 32)

CHEN, United States Magistrate Judge.

This matter came on for hearing on April 22, 2003. Robert Westerfield of Bowles & Verna appeared on behalf of the Petitioners and Mitchell Orpett of Tribler Orpett & Meyer appeared on behalf of Respondent. Having considered the arguments in support of and in opposition to Petitioners' motions to disqualify George M. Gottheimer as the neutral arbitrator and to vacate interim orders No. 2 and 3, and Respondent's motions to dismiss under Rule 12(B)(6) and to dismiss or in the alternative to stay proceedings, and the argument of counsel, and good cause appearing therefor, the Court hereby denies the petition to disqualify the Umpire, confirms Interim Order No. 2, and vacates Interim Order No. 3, and denies the motions to dismiss as moot.

## I. *INTRODUCTION*

### A. Factual Background and Procedural History

Petitioners Certain Underwriters at Lloyd's, London, Highlands Insurance Company, Ltd. and London & Edinburgh General Insurance Company, Ltd. ("Certain Underwriters") seek to disqualify George Gottheimer, Jr., the neutral umpire ("Umpire") of a pending arbitration proceeding between Certain Underwriters and Argonaut Insurance Company ("Argonaut") and to vacate certain interim orders issued by the Umpire. Respondent Argonaut moves to dismiss, pursuant to Rule 12(b)(6), or to stay, until after the arbitration hearing, both of Certain Underwriters' motions.

The parties entered into certain reinsurance agreements ("the Treaty"). The pending arbitration arose from a dispute regarding coverage under the Treaty. Argonaut had submitted claims to Certain Underwriters in the approximate amount of $2.5 million for legal expenses from an underlying coverage action between Argonaut and an alleged insured. Certain Underwriters denied coverage and initiated arbitration proceedings against Argonaut on December 14, 2001. Each party appointed a party arbitrator, and these party arbitrators nominated two candidates for the umpire position. George M. Gottheimer was selected as the Umpire. The Treaty contains an arbitration clause requiring that disputes be resolved in San Francisco. Whalen Dec., Exh. A, Art. 15.

The parties and the arbitration panel held an organizational meeting on November 25, 2002. Whalen Dec., Exh. F. Prior to this meeting the parties exchanged their respective preliminary position statements, and Argonaut claimed that Certain Underwriters was obligated to pay it $2,535,491.32 for legal expenses incurred in connection with the underlying insurance

coverage litigation. Argonaut contended that those expenses are covered as an "ultimate net loss," reimbursement to which it is entitled under the Treaty. Moreover, Argonaut contended it was entitled to immediate payment under the Treaty. Whalen Dec., Exh. F at 36–37. The Treaty (Art. 11) authorizes interim payments for losses.

At the meeting the Umpire asked, "There are funding requirements under the reinsurance agreement. In the absence of these funds, would Argonaut take a penalty to surplus[?]" *Id.* at 65. Evidently the Umpire was referring to a California insurer's annual filing requirements with the California Insurance Commissioner pursuant to Cal. Insurance Code §§ 922.22 *et seq.* Failure to receive payment before the end of the year has adverse implications for reporting purposes. At the organizational meeting, the arbitration panel orally issued Interim Order No. 1:

> [W]e order the Petitioner to establish an escrow in the amount of $2,535,491.32 to be held by counsel for the Respondent under the control of the Panel and that the escrow be established by December 31, 2002. The form of the escrow to be mutually agreed upon by the parties and if they cannot agree on the form of the escrow, that the Panel be contacted immediately and then we will order what form will be necessary.

Whalen Dec., Exh. F, at 67. *See also id.* at 72 (Mr. Gottheimer stating: "We have no particular feelings one way or the other about the form of the escrow, but the agreement must state that it is under the control of the Panel because that protects everybody in the event that one of the parties became bankrupt."). The December 31, 2002 deadline was apparently set with the reporting requirements in mind.

On December 18, 2002, more than three weeks after the organizational meeting, Certain Underwriters informed Argonaut's counsel that it would be complying with Interim Order No. 1 by filing a $2.5 million dollar bond. Whalen Dec., Exh. G. The bond itself was procured on December 19 but was not sent to Argonaut's counsel until December 26, 2002. Whalen Dec., Exh. G–H.

On December 24, 2002, Argonaut's counsel e-mailed Certain Underwriters counsel expressing its view that the bond was inadequate vis-a-vis California year-end relief from penalties for uncollected reinsurance. Argonaut also filed a motion with the panel to require interim payment or posting of letter of credit by Certain Underwriters by December 31, 2002. Whalen Dec., Exh. I. That motion was served on Certain Underwriters the afternoon of Christmas eve, but Certain Underwriters' attorneys' office was closed early for the holiday. The Umpire e-mailed the parties that same afternoon and informed them that it would respond to the motion soon. Whalen Dec., Exh. J.

On December 26, 2002, the Umpire e-mailed the parties, stating that the panel was issuing Interim Order No. 2 because the parties had not been able to agree to the form of the escrow. Whalen Dec., Exh. K. Interim Order No. 2 required Certain Underwriters to "either make an interim cash payment or post a Letter of Credit in the amount of $2,535,491.32" with five conditions:

(1) It shall be clean;

(2) It shall be irrevocable and unconditional;

(3) Drawn on a bank that is acceptable to the regulatory authorities having jurisdiction over the Respondent–Cross–Petitioner's [Argonaut's] reserves;

(4) Shall be issued for a period of not less than one year, and shall automatically be extended for one year from the date of its expiration, unless sixty (60)

days prior to any expiration date, the issuing bank shall notify Respondent–Cross–Petitioner by certified or registered mail that the issuing bank elects not to consider the Letter of Credit extended for an additional period;

(5) The Letter of Credit may be drawn upon at any time by sight draft, and no other documents need be presented.

Whalen Dec., Exh. K.

On December 27, 2002 counsel for Certain Underwriters e-mailed the Umpire and opposing counsel, stating that because of the Christmas holiday it had not reviewed Argonaut's motion prior to the issuance of Interim Order No. 2, to which it was now objecting. Whalen Dec., Exh. L. The Umpire responded indicating that he had not heard from Certain Underwriters between December 24 and 26, that Interim Order No. 2 was designed to allow Argonaut to avoid a penalty to surplus, and that the order would stand unless the parties could mutually agree to a suitable funding arrangement. Whalen Dec., Exh. M.

On December 30, 2002, counsel for Certain Underwriters responded to the previous e-mail by reiterating its belief that Interim Order No. 1 was designed to provide potential payment rather than actual payment to Argonaut. Certain Underwriters also objected to Interim Order No. 2, arguing that Interim Order No. 2 was in irreconcilable conflict with Interim Order No.1, and that the arbitration panel had effectively resolved a disputed coverage issue in Argonaut's favor without a hearing on the merits and before Certain Underwriters could obtain and review the necessary files from Argonaut. Whalen Dec., Exh. N.

On December 31, 2002, the Umpire took Certain Underwriters' correspondence under advisement, acknowledging that the penalty to surplus matter "raises other issues." Whalen Dec., Exh. O. That same day, counsel for Argonaut reiterated many of its concerns, including that Certain Underwriters was attempting to force Argonaut to accept the choice of a bond by proceeding to purchase a bond even though Argonaut had already expressed its objection that the bond did not comply with Interim Order No. 1. Whalen Dec., Exh. P. Argonaut also argued that it was ready to proceed with the file inspection, and that affording year-end relief to Argonaut was the intended purpose of Interim Order No. 1. *Id.*

The arbitration panel considered counsels' correspondence of December 30 and 31. Interim Order No. 2 was then modified on January 2, 2003, requiring Certain Underwriters to comply within 10 days, but also requiring that if Argonaut draws on the letter of credit, the arbitration panel would require Argonaut to establish an escrow in the same amount, to be held by counsel for Certain Underwriters, but under control of the panel. Whalen Dec., Exh. R. Certain Underwriters' position in the arbitration would thereby be secured.

On January 3, 2003, Certain Underwriters again challenged the propriety of Interim Order No. 2, and requested that it be stayed. Whalen Dec., Exh. S. This request by the panel was denied the same day. Whalen Dec., Exh. T. On January 8, 2003, Certain Underwriters also lodged a formal response to Argonaut's December 24, 2002 motion for interim payment or letter of credit, and Argonaut replied on January 11, 2003. Whalen Dec., Exh. U–W.

On January 13, 2003 the Umpire again directed Certain Underwriters to comply with Interim Order No.2. Whalen Dec., Exh. X. Certain Underwriters requested the opportunity for additional briefing regarding applicability of the California Insurance Code as well as the punitive nature of the Panel's order. Whalen Dec., Exh. Y. The next day the Umpire de-

clared, "The Panel feels that further briefing is unnecessary as Petitioners had ample time to brief the issues, and would be duplicative. Accordingly, the Panel's ruling of January 13, 2003 and Interim Order No. 2 must be complied with without further delay." Whalen Dec., Exh. Z.

With Certain Underwriters still not having complied with Interim Order No. 2, on January 22, 2003, Argonaut moved for $10,000 per day in sanctions to commence as of January 17. Whalen Dec., Exh. AA. On January 27, 2003, Certain Underwriters moved for the panel to remove the Umpire, alleging that there were justifiable doubts about Mr. Gottheimer's impartiality. Whalen Dec., Exh. BB. On January 29, Certain Underwriters also opposed the motion for sanctions, arguing that the arbitration panel's authority derived from the Treaty, and that the sanctions would not draw their essence from the Treaty. Whalen Dec., Exh. DD. Argonaut replied regarding sanctions on January 30, 2003, arguing that the panel must be granted broad latitude in interpreting the contract, and that sanctions were permissible because the parties had not agreed to limit the remedies that would be available to the panel. Whalen Dec., Exh. EE.

On January 31, 2003, the panel stayed the motion for sanctions pending the parties' agreement to submit to an independent consultant chosen by the panel (Paul Dassenko) to examine the penalty to surplus question. Whalen Dec., Exh. FF. Certain Underwriters objected to the designation of Dassenko as the independent consultant because he was an Argonaut-appointed arbitrator in other reinsurance arbitrations pending with Certain Underwriters. Whalen Dec., Exh. GG. While not opposing Dassenko, Argonaut pointed out that Dassenko had recently be retained as the opposing arbitrator and had ruled contrary to Argonaut's interests in the *Western MacArthur* litigation. Whalen Dec.,

Exh. HH. The panel found that Dassenko also served as Certain Underwriters' appointed arbitrator in two matters. Whalen Dec., Exh. MM. The panel overruled the objection to the consultant and denied the petition to remove the Umpire. *Id.*

On February 7, 2003, the panel issued Interim Order No. 3, which imposed sanctions on Certain Underwriters of $10,000 a day, dating back to January 17, 2003, for each day in which Certain Underwriters are not in compliance with Interim Order No. 2. Whalen Dec., Exh. MM. The panel also ruled that "If the Petitioners comply with Interim Order No. 2 on a timely basis, the Panel will revisit the sanctions ... and give consideration to the premium Petitioners paid for the bond." *Id.* The panel ordered the bond obtained by Certain Underwriters returned upon compliance with Interim Order No. 2. *Id.*

On March 3, 2003, Certain Underwriters filed an action in San Francisco Superior Court styled as a petition to disqualify the arbitration Umpire and to vacate Interim Orders No. 2 and No. 3. Argonaut removed this matter to the Northern District of California on March 18, 2003, claiming that the subject matter relates to an arbitration agreement covered by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. § 202.

**B. Jurisdiction**

■ The arbitration agreements between Certain Underwriters and Argonaut are commercial agreements between citizens of the United Kingdom and the United States, respectively. Argonaut removed this matter to the Northern District of California pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention"). Both the United States and the United Kingdom are signatories to the Convention. 9 U.S.C.A. § 201 note, at 515 (West

1999); *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1120 n. 3 (9th Cir.2002).

Article I of the Convention provides:

This Convention shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought, and arising out of differences between persons, whether physical or legal. It shall also apply to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought.

9 U.S.C.A. § 201 note, at 511(West 1999) (reprinting text of the Convention). Courts have broadly interpreted the phrase "not considered as domestic" in Article I to include arbitration awards "involving parties domiciled or having their principal place of business outside the enforcing jurisdiction." *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 19 (2d Cir.1997) (quoting *Bergesen v. Joseph Muller Corp.*, 710 F.2d 928, 932 (2d Cir.1983)). In other words, "[A]ny commercial arbitral agreement, unless it is between two United States citizens, involves property located in the United States, and has no reasonable relationship with one or more foreign states, falls under the Convention." *Jain v. de Mere*, 51 F.3d 686, 689 (7th Cir.1995). Certain Underwriters' principal place of business is outside the United States; it is a British entity. Thus, the Convention applies.[1]

The Convention is a basis for this Court's jurisdiction because the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201–208, provides that "an action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the Unites States ... shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy." 9 U.S.C. § 203.

## II. *LEGAL ANALYSIS*

### A. Choice of Law

The first issue is whether state or federal law applies. Certain Underwriters argue that the California Arbitration Act ("CAA") governs because (1) the CAA applies to all arbitrations occurring in California; (2) Argonaut's principal place of business is in California; and (3) forum selection clauses are widely enforced in international contract disputes. MPA in Support of Petition to Disqualify, at 4. Petitioners also argue that the FAA does not preempt the CAA. *Id.* at 4–5 (citing *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 477–79, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)).

■ This Court's analysis begins with a recognition that "the strong default presumption is that the FAA, not state law, supplies the rules for arbitration." *Sovak v. Chugai Pharmaceutical Co.*, 280 F.3d 1266, 1269 (9th Cir.2002). Such a strong default presumption is in keeping with Congress' purpose in enacting the FAA, which is to "overcome courts' refusals to enforce agreements to arbitrate" and to

---

1. Alternatively, this Court has diversity jurisdiction under the FAA because Certain Underwriters is a British entity and because the amount in controversy far exceeded the $75,000 minimum at the time of removal. *See G.C. and K.B. Investments, Inc. v. Wilson*, 326 F.3d 1096 n. 4 (9th Cir.2003) (Federal courts may only hear claims under the FAA when there is an independent basis for jurisdiction); *Baltin v. Alaron Trading Corp.* 128 F.3d 1466, 1470–71 (11th Cir.1997) (diversity is basis for jurisdiction to vacate arbitration award under the FAA); *Meritcare, Inc. v. St. Paul Mercury Ins. Co.*, 166 F.3d 214, 217–18 (3rd Cir.1999) (amount in controversy determined at time of removal).

place arbitration agreements "upon the same footing as other contracts." *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 270–71, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). Prior to the FAA, state and federal courts tended to prohibit arbitration clause enforcement, and passage of the FAA was " 'motivated, first and foremost, by a desire' to change this antiarbitration rule." *Id.* at 270–71, 115 S.Ct. 834 (citation omitted). Accordingly, the FAA "creates a body of federal substantive law of arbitrability, enforceable in both state or federal courts and pre-empting any state laws or policies to the contrary." *Ticknor v. Choice Hotels Int'l, Inc.,* 265 F.3d 931, 936 (9th Cir.2001).

That preemption, however, does not amount to complete field preemption of state law. The FAA permits parties to agree to arbitrate under state rules that differ from those set forth by the FAA itself, since that too is consistent with the FAA's purpose of placing arbitration agreements on the equal footing with other contracts. *Volt,* 489 U.S. at 479, 109 S.Ct. 1248. However, in order for state law to govern, the "parties must clearly evidence their intent to be bound by such rules." *Sovak,* 280 F.3d at 1269. For example, in *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), the parties' agreement regarding a securities trading account included an arbitration clause, as well as a choice-of-law provision applying New York law. *Id.* at 54–55, 115 S.Ct. 1212. After the arbitration panel awarded $400,000 in punitive damages for mishandling the account, Shearson moved to vacate this portion of the award because New York law does not permit arbitrators to award puni-

tive damages. *Id.* at 54–55, 115 S.Ct. 1212. The agreement itself contained no express reference to claims for punitive damages (*id.* at 59, 115 S.Ct. 1212) but the arbitration clause authorized arbitration in accordance with the rules of the National Association of Securities Dealers (NASD) or the New York Stock Exchange/American Stock Exchange, and NASD allows for punitive damages. *Id.* at 62, 115 S.Ct. 1212. The *Mastrobuono* Court reinstated the punitive damages award, by narrowly construing the application of state law. The Court held that "the best way to harmonize the choice-of-law provision with the arbitration provision is to read the laws of the State of New York to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators.' " *Id.* at 63–64, 115 S.Ct. 1212. While not entirely displacing state law, the presumptive force of the FAA resulted in a narrow interpretation of the state choice-of-law clause.

█ In the case at bar, the Court finds that Certain Underwriters cannot meet their burden of demonstrating that the arbitration agreement clearly intends the arbitration to be governed by the CAA rather than the FAA. The arbitration agreement in question merely states "Any such arbitration shall take place in San Francisco, California, unless some other location is mutually agreed upon by the Company and the Underwriters." Whalen Dec., Exh. A, Art. 15. This a venue clause, not a choice-of-law clause, much less a choice-of-law clause expressing clear intent to operate under different arbitration rules than those embodied in the FAA.[2]

**2.** Petitioners' reliance on *Vulcan Chemical Technologies, Inc. v. Barker,* 297 F.3d 332 (4th Cir.2002) is unavailing. As Petitioners point out, in *Vulcan,* the Fourth Circuit did find that "when Vulcan moved the California

court to compel arbitration in California, not only did it elect to use a California forum for the arbitration, it also inherently agreed to use the California state court system as its forum for sorting out the effect of the arbitra-

At the hearing, counsel for Certain Underwriters raised the additional argument that the CAA should apply because, by virtue of their actions in arbitration, the parties have chosen California law, which was evident by the fact that the concern that animated Interim Order No. 2 was a California law pertaining to penalty to surplus. But the arbitrator's recognition of the impact that California law would have on a party regarding financial reporting says nothing about the parties' intent to apply the FAA procedural and substantive rules governing the adjudication of the merits of the arbitration. In any event, even assuming *arguendo* that the parties' conduct in arbitration and the Umpires' order were premised in part on California law, this would not be dispositive of the choice-of-law question. A "ruling of an arbitration panel is not evidence of the parties' intent at the time of contracting." *Wolsey Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1211 (9th Cir.1998). Rather, "the paramount consideration" in interpreting a contract under California law is "the parties objective intention *at the time of contracting*." *Id.* at 1210 (citing *Porreco v. Red Top RV Center*, 216 Cal.App.3d 113, 264 Cal.Rptr. 609 (1989) (emphasis added)). Here there is no evidence at the time of contracting that the parties intended to be governed by the California law rather than the FAA. This Court concludes the FAA applies. *See Mastrobuono*, 514 U.S. at 55–64, 115 S.Ct. 1212; *Sovak*, 280 F.3d at 1269.

Certain Underwriters argue that *Volt*, 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488, dictates that California law, not the FAA, governs the arbitration. MPA in Support of Petition to Disqualify, at 4–5. In *Volt*, the Supreme Court held that the FAA did not preempt the provision of the CAA which permits courts to stay arbitration where the state court in interpreting the contract concluded that the parties had agreed to abide by the CAA. *Id.* at 478–79, 109 S.Ct. 1248. *Volt* is inapposite, however. In *Volt*, the Court held that because the Supreme Court "does not sit to review" a state court's interpretation of a private contract, the Court "assum[ed] the choice-of-law clause meant what the Court of Appeal found it to mean ..." 489 U.S. at 474, 476, 109 S.Ct. 1248. Here, there is no state court interpretation of the arbitration contract to which to defer. The issue is presented to this Court *de novo*. Unlike *Volt*, the strong default presumption that federal law under the FAA governs obtains with full force. *See Mastrobuono*, 514 U.S. at 60 n. 4, 115 S.Ct. 1212 ("[In *Volt* ] we deferred to the California court's construction of its own State's law. ... In the present case, by contrast, we review a *federal* court's interpretation of this contract, and our interpretation accords with that of the only decision-maker arguably entitled to deference—the arbitrator.") (emphasis in original); *Wolsey*, 144 F.3d at 1213 ("[I]n interpreting the Development Agreement, we are bound by *Mastrobuono*, not by *Volt*. Because *Mastrobuono* dictates that general choice-of-law clauses do not incorporate state rules that govern the allocation of authority between courts and arbitrators, the district court erred ...");

tion." *Id.* at 339. However, *Vulcan* is inapplicable here, since in that case Vulcan first moved to compel arbitration in Sacramento Superior Court, than after a $21 million dollar arbitration award was rendered in favor of Barker, Vulcan moved to vacate the arbitration award in the Western District of Virginia contemporaneous with Barker moving to confirm the award in California Superior Court.

*Id.* at 335–37. Thus, the main issue in that case was whether the Virginia court abused its discretion by not abstaining under the *Colorado River* doctrine. *Id.* at 338, 340–44 (applying *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). *Vulcan* simply did not address the choice-of-law question posed here.

*Chiron Corp. v. Ortho Diagnostic Systems, Inc.,* 207 F.3d 1126, 1131 (9th Cir.2000) ("In light of *Mastrobuono* and *Wolsey,* the district court correctly found that the federal law of arbitrability under the FAA governs the allocation of authority between courts and arbitrators.").

■ Not only does the FAA apply as the presumptive default, it applies under traditional preemption analysis. In the instant case, there may be a divergence between the CAA and the FAA regarding, *inter alia,* the permissibility of disqualifying an arbitrator prior to the issuance of a final arbitration award.[3] While Certain Underwriters contends that California law permits the disqualification of an arbitrator (MPA in Support of Petition to Disqualify, at 5), federal law clearly does not, as discussed below. Where there is an "actual conflict" between state and federal law, absent the parties' clear choice-of-law to the contrary, federal law preempts. *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941). *See also Ting v. AT&T,* 319 F.3d 1126, 1147–48 (9th Cir.2003) (The FAA preempts conflicting anti-waiver provision of California Consumer Legal Remedies Act).

### B. Motion to Disqualify the Umpire

■ At the hearing, counsel for Certain Underwriters acknowledged there are, to his knowledge, no federal cases in which a court has issued an order disqualifying a neutral arbitrator once arbitration had commenced but prior to a final arbitration

award. Although the Ninth Circuit appears not to have reached the issue, other courts have consistently held that courts do not have the power under the FAA to disqualify an arbitrator while proceedings are pending. *See Gulf Guaranty Life Ins. Co. v. Connecticut General Life Ins. Co.,* 304 F.3d 476, 490 (5th Cir.2002): ("[E]ven where arbitrator bias is at issue, the FAA does not provide for removal of an arbitrator from service prior to an award, but only for potential vacatur of any award … the FAA appears not to endorse court power to remove an arbitrator for any reason prior to issuance of an arbitral award."); *Aviall, Inc., v. Ryder Sys. Inc.,* 110 F.3d 892, 895 (2d Cir.1997) ("Although the FAA provides that a court can vacate an award where there was evident partiality or corruption in the arbitrators, … it does not provide for pre-award removal of an arbitrator."). *See also Cox v. Piper, Jaffray & Hopwood, Inc.* 848 F.2d 842, 843–44 (8th Cir.1988); *Florasynth, Inc. v. Pickholz,* 750 F.2d 171, 174 (2d Cir.1984); *Alter v. Englander,* 901 F.Supp. 151, 153 (S.D.N.Y.1995). There is a strong basis in FAA policy for such a rule. As the Fifth Circuit noted in *Gulf Guaranty:*

> A 'prime objective of arbitration law is to permit a just and expeditious result with a minimum of judicial interference' and any other such rule could 'spawn endless applications to the courts and indefinite delay' and that otherwise 'there would be no assurance that the party seeking removal would be satisfied with the removed arbitrator's successor

3. Certain Underwriters argue that the CAA allows for a challenge to an arbitrator when "circumstances exist that give rise to justifiable doubts as to his or her independence or impartiality." MPA in Support of Motion to Disqualify, at 3 (citing Cal.Civ.Proc.Code § 1297.124). Cal.Civ.Proc.Code § 1297.134 allows a Superior Court to resolve a challenge

of an arbitrator within 30 days after the party receives notice of the arbitration panel's rejection of the challenge. It does not expressly address such a challenge in the midst of substantive arbitration proceedings. In any event, because this Court finds that it must apply the FAA, it does not reach the issue of disqualification under the CAA.

and would not bring yet another proceeding to disqualify him or her.'

304 F.3d at 492 (quoting *Marc Rich & Co. v. Transmarine Seaways Corp.*, 443 F.Supp. 386, 387–88 (S.D.N.Y.1995)). Disqualifying an arbitrator can be highly disruptive to the expeditious arbitration process fostered by the FAA.

Certain Underwriters argue that the Ninth Circuit's decision in *Pacific Reinsurance Management Corp. v. Ohio Reinsurance Corp.* 935 F.2d 1019 (9th Cir. 1991), though not directly on point, suggests that disqualification is proper, because interim orders such as those issued herein are "final" for purposes of judicial review, and that disqualification after issuance of a "final" award is appropriate. In *Pacific Reinsurance*, the arbitration panel issued an interim order requiring members of a reinsurance pool to contribute to an escrow account during the pendency of the arbitration as security for any final award. The Ninth Circuit held that the district court had the power to review such an interim award. The Ninth Circuit recognized that temporary equitable relief may be essential to preserving assets or enforcing performance, and that such relief needs to be judicially enforceable at the time it is granted in order to be meaningful. 935 F.2d at 1022–23. In was in this context that the *Pacific Reinsurance* panel ruled that court enforcement of interim equitable awards "is not an 'undue intrusion upon the arbitral process,' but is essential to preserve the integrity of that process." *Id.* at 1023 (citation omitted); *see also Yasuda Fire & Marine Ins. Co. of Europe Ltd. v. Continental Cas. Co.*, 37 F.3d 345, 348–351 (7th Cir.1994) (finding *Pacific Reinsurance* persuasive, and ruling that arbitrators could require letter of credit as interim relief since this would merely preserve the party's stake in the controversy, and was consistent with protecting the bargain that gave rise to arbitration). Moreover, the issues regarding the interim award were self-contained and distinct from the merits of the arbitration. *Pacific Reinsurance* thus concluded such an award, though interim, was sufficiently "final" to permit judicial review under the FAA. *Id.* at 1022–26.

Certain Underwriters argue that since an interim order (as was issued here) can be treated as a final award pursuant to *Pacific Reinsurance*, the door should be open for a court to remove an arbitrator for bias after such an award. MPA in Support of Petition to Disqualify, at 6–7. The Court disagrees. Even though an interim award may itself be deemed final for purposes of judicial review, the fact remains that the arbitration proceedings are still pending. Thus, *Pacific Reinsurance* and *Yasuda* are inapposite. Rather than facilitating the arbitral process, judicial intervention in the form of disqualifying an arbitrator during the pendency of the arbitration would thwart the "prime objective of arbitration law [which] is to permit a just and expeditious result with a minimum of judicial interference." *Gulf Guaranty*, 304 F.3d at 492. Rather than enhancing the arbitral process by court enforcement of interim relief designed to ensure any eventual award will be meaningful, allowing a disqualification during the arbitration could "spawn endless applications to the courts and indefinite delay." *Id.* While judicial review and enforcement of an interim award is not an "undue intrusion upon the arbitral process," (*Pacific Reinsurance*, 935 F.2d at 1023 (citation omitted)), judicial disqualification of an arbitrator during the pendency of arbitration is. Simply put, the policy rationale in *Pacific Reinsurance* does not diminish the reasoning and conclusion of the Fifth Circuit's analysis in *Gulf Guaranty*.

Finally, the Court notes that under *Pacific Reinsurance* and the FAA, Certain Underwriters has a remedy for bias—it

can obtain judicial review of the merits of the award. That, rather than disqualification, is the appropriate remedy for any alleged error due to bias. Indeed, as noted below, evident partiality of the arbitrator is one ground for vacating an award under the FAA.

Accordingly, Certain Underwriters' motion to disqualify the neutral Umpire is denied.

## C. Motion to Vacate Interim Order No. 2

Unlike an arbitrator disqualification motion, this Court has authority under the FAA to review and vacate an arbitration panel's interim order that *e.g.* sets up an escrow account or requires a party to post a letter of credit as interim security pending arbitration. *Pacific Reinsurance,* 935 F.2d at 1022–23; *Yasuda,* 37 F.3d at 348– 49; *Island Creek Coal Sales Co. v. Gainesville,* 729 F.2d 1046, 1049 (6th Cir.1984); *Sperry Int'l Trade, Inc. v. Israel,* 689 F.2d 301, 304 n. 3 (2d Cir.1982). As noted above, such an order is sufficiently "final" to permit judicial review.

This scope of this Court's review, pursuant to the FAA, is limited; it may vacate an award on only the following four grounds:

(1) Where the award was procured by corruption, fraud, or undue means;

(2) Where there was evident partiality or corruption in the arbitrators, or either of them;

(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or any other misbehavior by which the rights of any party have been prejudiced; or

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a); *see also Pacific Reinsurance,* 935 F.2d at 1023.[4]

### (1) Did the Arbitration Panel Exceed its Powers?

Judicial review on this question is quite limited, since the Court "must not decide the rightness or wrongness of the arbitrators' contract interpretation, only whether the panel's decision 'draws its essence' from the contract." *Pacific Reinsurance,* 935 F.2d at 1024. In other words, "As long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers Int'l Union AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987).

There is no question that an arbitration panel has the authority to require escrow to serve as security for an ultimate award, which is what Interim Order No. 1 accomplished. That authority may be either derived explicitly from the arbitration agreement or implicitly from the panel's power to ensure the parties receive the benefit of their bargain. *See Pacific Reinsurance,* 935 F.2d at 1024–25; *Yasuda,* 37 F.3d at 351. Interim Order No. 2 differs from Interim Order No. 1, however, insofar as it is intended to effectuate an interim payment to Argonaut and not just to provide security against insolvency. After the parties could not agree to the form of the escrow, Interim Order No. 2 of Decem-

---

4. Certain Underwriters do not allege that the Interim Orders were "procured by corruption, fraud, or undue means" (9 U.S.C. § 10(a)(1)). Thus, the Court does not reach this question.

ber 26, 2002 required Certain Underwriters to "either make an interim cash payment or post a Letter of Credit in the amount of $2,535,491.32" with the condition, *inter alia*, that it be clean, irrevocable and unconditional. Whalen Dec., Exh. K. Interim Order No. 2 was then modified on January 2, 2003, requiring that if Argonaut draws on the letter of credit, Argonaut must establish an escrow in the same amount. Whalen Dec., Exh. R.

Under *Pacific Reinsurance,* the question at bar is whether by going beyond the mere posting of security and requiring payment, the panel was not "even arguably construing or applying the contract," and thus exceeded its powers. *United Paperworks.,* 484 U.S. at 38, 108 S.Ct. 364. The Court concludes that the order, despite its breadth, draws its essence from the Treaty. As noted above, Argonaut claims it is entitled to reimbursement of $2.5 million in legal fees incurred pursuant to its interpretation of the ultimate loss provision of the Treaty. The Treaty's ultimate net loss provision states:

> The term "ultimate nett [sic] loss" shall mean the sum actually paid by the Company for losses or to discharge liability after making deductions for all recoveries, all salvages, and all claims upon other reinsurances, whether collected or not, and shall exclude all adjustment expenses other than undercover and legal expenses arising from the settlement of claims. Nothing in this clause, however, shall be construed to mean that losses are not recoverable from the Underwriters until the ultimate net loss to the Company has been ascertained.

Whalen Dec., Exh. A, Art. 7.

While disputed by Certain Underwriters, the approximately $2.5 million claimed by Argonaut could be deemed a non-excluded "sum actually paid by the Company" under Article 7 of the Treaty. Moreover, Article 11 authorizes interim payments for compensable losses. Whalen Dec., Exh. A, Art. 11 ("At the request of the Company, Underwriters will make interim payments to the Company upon losses incurred under this Agreement …"). Interim Order No. 2 thus draws its essence from the contract.

This inference is supported not only by the text provision of the Treaty, but also by the record in the arbitration. For example, in the preliminary statement to the panel during the November 25, 2002 organizational meeting, counsel for Argonaut made reference to its entitlement to immediate payment or funding under the Treaty. Whalen Dec., Exh. F, at 36–37 (Mr. Orpett stating, "There has never been any payment under this treaty as required under the treaty. And as a result we think that Petitioners should be found to have breached, should be ordered to pay and pay now and bring it current."). In its December 24, 2002 motion to the panel, Argonaut again argued that Certain Underwriters was immediately obligated to pay on an interim basis pursuant to the Treaty. Whalen Dec., Exh. I, ¶ 5.

That Certain Underwriters and even the court might disagree with the panel's interpretation does not warrant vacatur, given the Court's narrow scope of review under the FAA. *Pacific Reinsurance,* 935 F.2d at 1025 (in determining whether arbitrators exceeded their power " 'the district court must accord considerable deference to the arbitrator's judgment' and should not 'vacate the award because it interpreted the agreement differently.' ") (citing *New Meiji Market v. United Food & Comm'l Workers Local Union 905,* 789 F.2d 1334, 1335–36 (9th Cir.1986)). All that is required to uphold the award is that the arbitrator is "even arguably construing or applying the contract." *United Paperworks.,* 484 U.S. at 38, 108 S.Ct. 364. Moreover, in order to find that the order

drew its essence from the contract, the Court need not find an explicit statement of the arbitrators so stating. *Yasuda,* 37 F.3d at 349 ("It is only when the arbitrator *must* have based his award on some body of thought, or feeling, or policy, or law that is outside the contract ... that the award can be said not 'to draw its essence from the [contract].' ") (emphasis in original, citation omitted).

As to Certain Underwriters' contention that the panel exceeded its power in issuing Interim Order No. 2 because by requiring the payment via clean letter of credit in Argonaut's favor, the panel essentially decided the ultimate merits of the case (MPA in Support of Petition to Vacate, at 1–2, 4), that contention overstates the effect of the panel's order. The relief that was ordered by the panel was interim, and did not purport to make a final ruling on the substantive issue. The January 2, 2003 modification of Interim Order No. 2, requiring Argonaut to establish an escrow under control of the panel for the $2.5 million if Argonaut drew on the letter of credit, ensured that Certain Underwriters' rights would be preserved for full and final adjudication. The situation here is analogous to a preliminary injunction because Certain Underwriters' ultimate financial position was fully protected by the escrow requirement. *See Compania Chilena De Navegacion Interoceanica S.A. v. Norton, Lilly & Co., Inc.,* 652 F.Supp. 1512, 1516–17 (S.D.N.Y.1987) (arbitration panel had discretion to order defendant to post a bond because this was an equitable remedy which constituted "in effect, a grant of a preliminary injunction.") (citation omitted).

Finally, the fact that the arbitration panel, in setting a December 31, 2002 deadline for posting the letter of credit, took into account Argonaut's interests in avoiding the penalty to surplus reporting requirement (Whalen Dec., Exh. F, at 70–72;

Whalen Dec., Exh. I, ¶ 11), a concern that is not reflected in any particular provision of the Treaty, does not gainsay the fact that the *authority* for requiring an interim payment arguably resided in the Treaty. Arguably, the panel sought to limit the adverse consequences of Certain Underwriters' alleged failure to fulfill its obligations under the Treaty.

The Court's conclusion that the panel did not exceed its authority is substantiated by the fact that "the parties' arbitration clause does not limit the panel's power to resolve issues presented to it, the panel had the authority to settle and determine the dispute appropriately." *Michigan Mut. Ins. Co. v. Unigard Security Ins. Co.,* 44 F.3d 826, 831 (9th Cir.1995). The conferral of authority upon the arbitrator here was broad. *See* Whalen Dec., Exh. A, Art. 15 ("The arbitrators shall consider this Agreement an honorable engagement rather than merely a legal obligation; they are relieved of all judicial formalities and may abstain from following the strict rules of law."). Thus, the arbitration panel was "implicitly empowered" by the contract to "formulate appropriate relief for any dispute submitted to it." *Michigan Mut. Ins. Co.,* 44 F.3d at 831. *See also United Paperworks.,* 484 U.S. at 38, 108 S.Ct. 364 ("[B]ut the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract.").

In summary, given the narrow scope of review and the generous deference to be accorded to arbitrators under the FAA, and having found an identifiable basis in the contract for the interim order, the Court cannot conclude that the arbitration panel exceeded its powers in issuing Interim Order No. 2 as modified.

### (2) Was There Evident Partiality?

■ There are two standards for what constitutes "evident partiality." First, where an arbitrator fails to disclose relevant facts, such as the arbitrator's relationship with a party or counsel, vacatur is appropriate when the non-disclosure gives the impression of bias in favor of one party. *Woods v. Saturn Distribution Corp.*, 78 F.3d 424, 427 (9th Cir.1996); *Schmitz v. Zilveti*, 20 F.3d 1043, 1047 (9th Cir.1994). For example, in *Schmitz*, vacatur was warranted where the arbitrator simply failed to investigate and discover potential conflicts of interest within his firm. 20 F.3d at 1048. However, in this case, Certain Underwriters do not allege that Interim Order No. 2 should be vacated because the Umpire failed to disclose facts that give the impression of a conflict of interest. MPA in Support of Petition to Vacate, at 8–12.

Thus, the Court applies the second, more stringent, standard which governs cases involving allegations of actual bias. In actual bias cases, the mere appearance of impropriety is not enough; rather, "the party alleging evident partiality must establish specific facts which indicate improper motives." *Woods*, 78 F.3d at 427 (citing *Sheet Metal Workers Int'l Ass'n Local Union No. 420 v. Kinney Air Conditioning Co.*, 756 F.2d 742, 746 (9th Cir. 1985)). *See also Toyota of Berkeley v. Automobile Salesmen's Union*, 834 F.2d 751, 755–56 (9th Cir.1987). The bias of an arbitrator must be "direct and definite." *Sofia Shipping Co. Ltd. v. Amoco Transp. Co.*, 628 F.Supp. 116, 119 (S.D.N.Y.1986). The challenging party carries the burden of proof. *Woods*, 78 F.3d at 427; *Kinney Air Conditioning Co.*, 756 F.2d at 745.

■ In this case, Certain Underwriters do not point out any extrinsic evidence that the Umpire has a secret relationship with Argonaut or possessed some pre-existing bias against Certain Underwriters. Rather, Certain Underwriters argues that the Umpire's rulings evidence a bias against it. In particular, Certain Underwriters contend that the Umpire was particularly solicitous of Argonaut's need for the interim payment because of the penalty to surplus problem, and that this concern drove the timing and the substance of Interim Order No. 2. Yet, the Court cannot presume that Mr. Gottheimer was motivated by an extrajudicial bias. It may have reflected his preliminary view that there was a substantial likelihood that Argonaut would prevail on the merits and that the interim payment to which Argonaut may have been entitled was necessary in order to prevent prejudice resulting from reporting requirements, requirements of which the Umpire was aware based on his experience in the insurance field.

The Court finds that a significant factor weighing against a finding of evident partiality is that Interim Order No. 2 was modified by the arbitration panel soon after receiving objections for Certain Underwriters. As modified, the order requires that if Argonaut drew on the letter of credit, it would have to establish an escrow in the same amount, under control of the panel, in order to protect Certain Underwriters' ultimate position in the arbitration. Whalen Dec., Exh. R.

■ In any event, the fact that an arbitrator "consistently relied on evidence and reached conclusions favorable" to one party, is not enough establish "evident partiality." *Bell Aerospace Co. Div. of Textron, Inc. v. Local 516*, 500 F.2d 921, 923 (2d Cir.1974). There is no evidence here that the Umpire "was predisposed to favor either party, or that he acted out of any improper motives." *Id.* Petitioners have not set forth "specific facts which indicate improper motives." *Woods*, 78 F.3d at 427.

Certain Underwriters also contend that the Umpire engaged in numerous procedural irregularities which evidence bias. It argues that Interim Order No. 2 was issued without proper notice and without the opportunity for Certain Underwriters to respond. However, the panel indicated at the November 25, 2002 organizational meeting that the form of the escrow was to be mutually agreed upon by the parties and that if the parties were unable to agree to a mutually acceptable form of escrow the panel was to be informed immediately so that it could direct what form would be necessary. Whalen Dec., Exh. F, at 67. The impending December 31, 2002 deadline for reporting purposes was looming, and the panel and parties were aware of that fact. Immediate notification after the organizational meeting as to an acceptable form of escrow did not occur; Certain Underwriters did not inform opposing counsel until December 18, 2002 that it would be filing a bond. Argonaut objected six days later. Whalen Dec., Exh. G, Exh. I. Given the limited time frame and the fast approaching December 31 deadline, the Court cannot presume that the panel acted with improper purpose in issuing Interim Order No. 2 on such an expedited basis.[5] Moreover, as previously noted, the Umpire and the pan-

---

**5.** Certain Underwriters cite other procedural irregularities. It contends Interim Order No. 2 was issued before Certain Underwriters' arbitrator ever learned of it. MPA in Support of Petition to Vacate, at 1, 10; MPA in Support of Petition to Disqualify, at 11. But this claim gets into the internal deliberation of the panel, which the Court concludes is not warranted in this case. *In the Matter of the Petition of Fertilizantes Fosfatados Mexicanos, S.A.*, 751 F.Supp. 467, 468 n. 1 (S.D.N.Y. 1990) ("This case should not be viewed as a precedent in any way for inquiry into the deliberations of an arbitration panel. Such matters should remain confidential and inviolate."); *Lewis v. NLRB*, 779 F.2d 12, 13 (6th Cir.1985) ("We do not approve the practice of calling arbitrators as witnesses with respect to the matters heard by the panel or considered by them in reaching their decisions."). The declarations of John Wulfers and Stanley Holloway on this point are therefore stricken.

Even if the evidence were considered, it only establishes that Mr. Holloway did not learn of the order until after its issuance; it does not establish that the Umpire made no effort to contact Holloway. The Court notes that the Umpire and Argonaut's arbitrator lived in New Jersey and New York, respectively, whereas Certain Underwriters' arbitrator lived in England. The e-mail that Argonaut's counsel sent on December 24, 2002—indicating its opposition to the bond and attaching its motion for an interim payment or letter of credit—was sent to Mr. Holloway along with the other arbitrators and Certain Underwriters' counsel. Whalen Dec., Exh. I. That email also indicates that because Argonaut did not have a fax number for Holloway, his paper copy was sent by Federal Express. *Id.* In light of the holidays and time zone differences, it is therefore plausible that an e-mail was sent to Holloway on December 24, 2002, but that he did not retrieve it until after December 26, 2002 or shortly thereafter.

A related point by Certain Underwriters is the argument that Gottheimer "misrepresented" that "the Panel" had considered Argonaut's motion and issued Interim Order No. 2. MPA in Support of Petition to Disqualify, at 11. For the reasons stated above, this does not rise to the level of an indictable procedural irregularity. "The Panel" and "a majority of the Panel" are functionally equivalent with respect to decisionmaking power, and the former may simply have been shorthand for the latter.

Certain Underwriters also contend the Umpire evidenced bias in appointing Paul Dassenko as a consultant even over the objection of Certain Underwriters that Dassenko concurrently served as the appointed arbitrator for Argonaut in three arbitrations. MPA in Support of Petition to Disqualify, at 13–14. Certain Underwriters argues that this "was a particularly galling assault" on its rights and interests, and that Certain Underwriters' objections were summarily rejected by the Umpire. *Id.* at 14. But without additional facts, it is not undisputably clear that Dassenko's appointment was necessarily improper or done with improper notice. The cover letter to Interim Order No. 3 indicates that the panel considered Certain Underwriters' objections to Dassenko, but ultimately rejected the argument that Dassenko was partial to Argonaut because he was currently serving as Cer-

el did entertain the subsequent filings of Certain Underwriters immediately thereafter, and the panel modified the order in an important respect to protect Certain Underwriters' interests, requiring Argonaut to establish an escrow if it were to draw on the letter of credit. Whalen Dec., Exh. M, Exh. R. The panel's revised order of January 2, 2003 also gave Certain Underwriters ten additional business days to comply. *Id.* at Exh. R. Interim Order No. 3, imposing a daily penalty for non-compliance with Interim Order No. 2 as modified, was not issued until after Certain Underwriters were afforded several weeks within which to comply with Interim Order No. 2. In summary, the rigorous standard for evident partiality is not met here.

### (3) Was the Arbitration Panel Guilty of Misconduct?

An arbitration panel's order may be vacated for misconduct if, *e.g.*, there is ex parte evidence presented to the panel that disadvantages a party in violation of its right to submit and rebut evidence. *Pacific Reinsurance*, 935 F.2d at 1025. As the court explained in *Compania Chilena*, "In considering claims of arbitrator misconduct based on procedural rulings, courts should not unduly intrude on appropriate exercises of discretion by an arbitration panel. 'An arbitrator's ruling on procedural issues will not be overturned ... unless it had the effect of denying the parties a fundamentally fair hearing, or was otherwise an unreasonable decision that prejudiced the rights of a party.' " 652 F.Supp. at 1515 (citation omitted).

Certain Underwriters argue that the Umpire "utterly disregarded" its rights by issuing Interim Order No. 2 on December 26, 2002 without first allowing Certain Underwriters an opportunity to respond to

Argonaut's motion filed on Christmas eve. MPA in Support of Petition to Vacate, at 10. It also characterizes the after-the-fact briefing and modification of the order as meaningless exercises in which the Umpire "attempted to cover his tracks." *Id.* at 11. However, for the reasons mentioned above, it appears that the Umpire and the panel perceived that it was under a time constraint in attempting to minimize prejudice to Argonaut resulting from its failure to receive an interim payment arguably due under the Treaty. This compressed time frame was partly of Certain Underwriters' own making. More than three weeks after the organizational meeting in which the panel made clear that a mutually agreed upon form of escrow would be required (Whalen Dec., Exh. F, at 67), Certain Underwriters proposed to satisfy Interim Order No. 1 by a bond rather than an escrow.

Moreover, as previously noted, the record establishes that Argonaut's motion seeking Interim Order No. 2 was e-mailed to Certain Underwriters on December 24, 2002 and that the Umpire e-mailed the parties that same date indicating the panel would respond soon. After Interim Order No. 2 was issued, the arbitration panel provided Certain Underwriters ample opportunity to object, and the panel did modify the order. The post-order briefing was thus far from being meaningless.

The procedures undertaken did not deprive Certain Underwriters of a "fundamentally fair hearing," nor did it "prejudice the rights" of the Petitioners. *Compania Chilena*, 652 F.Supp. at 1515.

### D. Motion to Vacate Interim Order No. 3

■ Certain Underwriters argue that the arbitration panel did not have the au-

---

tain Underwriters' appointed arbitrator in two matters. Whalen Dec., Exh. MM. Thus, there is no evidence that Dassenko and his

record were not properly examined by the Umpire to ensure Dassenko's ability to perform this assignment fairly.

thority to issue Interim Order No. 3 which imposed sanctions of $10,000 per day for non-compliance with Interim Order No. 2, and that Order No. 3 derives from misconduct. MPA in Support of Petition to Vacate, at 12–13. As noted above, the Court finds the proceedings were not infected by any misconduct by the Umpire or the panel. Certain Underwriters were afforded ample opportunity to object to and comply with these interim orders. Thus, the question before the Court is whether the Umpire and the panel exceeded its powers in issuing Interim Order No. 3.

Interim Order No. 3 was issued by the panel on February 7, 2003, after objections to Interim Order No. 2 were filed and considered by the panel, and after Argonaut moved for sanctions on January 22. Interim Order No. 3 required the following:

> Petitioners, jointly and severally, are ordered to pay Respondent, in addition to the amount set forth in Interim Order No. 2, the additional sum of $10,000.00 for every day that they [Certain Underwriters] are not in compliance with that Order, commencing on January 17, 2003, the first day following the date on which payment was to have been made or letter or credit established.

Whalen Dec., Exh. MM.

The threshold question is whether arbitrators have the authority to sanction non-compliance with their orders. In *Pacific Reinsurance*, the Ninth Circuit stated, "Arbitrators have no power to enforce their decisions. Only courts have that power." 935 F.2d at 1023. Arguably, this language could be interpreted broadly to mean that the imposition of sanctions, one method of "enforcing" an order, is not authorized under the FAA. However, the language could also simply mean that arbitrators do not have the ability to effectuate execution of an award as courts have the power to issue *e.g.* writs of execution and attachment.[6]

The Court is persuaded that the language of *Pacific Reinsurance* should be narrowly construed. A number of courts have held that arbitrators have authority to sanction outrageous conduct or non-compliance with its interim orders. In *Polin v. Kellwood Co.*, 103 F.Supp.2d 238 (S.D.N.Y.2000), *reconsideration denied* 132 F.Supp.2d 126 (S.D.N.Y.2000), the arbitration panel rendered a final award entitling the defendant to half of its expenses, including attorney fees, as a sanction for outrageous conduct and refusal to respond to the panel's questions by plaintiff's counsel. In *Konkar Maritime Enterprises, S.A. v. Compagnie Belge D'Affretement,* 668 F.Supp. 267, 274 (S.D.N.Y.1987), the court ruled that "it was not improper for the Panel to consider respondent's failure to comply with its interim order" in assessing 85% of the costs against the party that had ignored an escrow account order. In both *Polin* and *Konkar,* the courts found that the final allocation of fees and costs which reflected the panel's effective imposition of sanctions was within the grant of authority conferred by the arbitration agreement upon the arbitrators.

■ Accordingly, there is no categorical ban to an arbitrator's imposition of sanctions for non-compliance with his or her orders. The more specific question in the case at bar is whether the daily sanctions imposed by Interim Order No. 3 exceeded the panel's authority. There are two possible sources for such power: authority that inheres in the FAA itself and the arbitration contract as construed in light of FAA policy.

---

6. An arbitrator's power to issue classwide injunctive relief may also be limited. *See Cruz v. PacifiCare Health Systems,* 30 Cal.4th 303, 133 Cal.Rptr.2d 58, 66 P.3d 1157 (2003).

The Court concludes the FAA does not affirmatively grant inherent authority to impose the sanction contained in Interim Order No.3 for several reasons. First, the imposition of a fine of $10,000 per day for each day of non-compliance with Interim Order No. 2 is akin to civil contempt issued by a court. *Cf. Int'l Union, United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 829, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (civil contempt "coerce[s] the defendant into compliance with the court's order ...". In an analogous context, the courts have found that non-Article III magistrate judges do not have the inherent power to punish for contempt. *Bingman v. Ward,* 100 F.3d 653, 656–57 (9th Cir.1996); *In re Sequoia Auto Brokers Ltd., Inc.,* 827 F.2d 1281, 1290 n. 16 (9th Cir.1987). Their contempt power derives solely from a statutory grant of authority. *See* Mark S. Kende, *The Constitutionality of New Contempt Powers for Federal Magistrate–Judges,* 53 Hastings L.J. 567, 568–75 (2002) (Federal Courts Improvement Act of 2000 statutorily conferred limited contempt powers upon magistrate judges); *see also* 28 U.S.C. § 636(e). Nothing in the explicit language of the FAA authorizes such inherent power upon arbitrators.

Second, the imposition of the equivalent of civil contempt, imposing a daily penalty for non-compliance of an interim order, could burden a party's right to pursue judicial review of a "final" interim order such as Interim Order No. 2—a right established in *Pacific Reinsurance.* Such a sanction imposes a substantial risk on the appealing party—given the time it takes to seek judicial review and obtain a ruling, it risks incurring a substantial fine in the event it does not obtain vacation of the order. As of the date of this Order for instance, the fine under Interim Order No. 3 is approximately $900,000. Such a risk could pose a substantial impediment to judicial review and undermine the FAA policies the court in *Pacific Reinsurance* sought to vindicate.[7]

This is not to say that the parties cannot agree by arbitration contract to confer on the arbitrator power to impose monetary sanctions for non-compliance. Even if judicial review and enforcement of an interim order were available under *Pacific Reinsurance,* in light of the strong public policy favoring expeditious arbitration, the parties should not be barred from consensually conferring such power on the arbitrator; enforcement via sanctions by the arbitrator is likely to be more efficient than mandating judicial review and enforcement in every instance.

However, where the nature of the sanction involved seeks to coerce compliance at the expense of a party's right under the FAA to seek judicial review, as in the instant case, the potential for conflict with FAA policy counsels in favor of requiring that any intent of the parties to afford contempt-like power on the arbitrator must be clearly evident. *Cf. Mastrobuono,* 514 U.S. at 55–64, 115 S.Ct. 1212 (New York choice-of-law provision insufficient to find that parties agreed to special rules limiting the authority of arbitrators rather than being bound by FAA rules); *Sovak,* 280 F.3d at 1269 ("FAA, not state law, supplies the rules for arbitration" unless the parties "clearly evidence their intent to be bound by such rules.").

There is no clear grant of authority to impose mounting punitive sanctions equivalent to civil contempt in the Treaty herein

---

7. While the party seeking review could seek a stay pending judicial review, access to judicial review would turn on whether a stay is granted. Absent a stay, the party may be forced to abandon the appeal and simply comply. Moreover, even obtaining a ruling on a stay takes time.

even though the panel's grant of authority is generally broad.[8] Indeed, unlike *Polin* and *Konkar*, the sanction was not imposed under the auspices of the arbitrators' power under the governing agreement to allocating fees and costs. Indeed, the Treaty in the instant case mandates that the expense of the arbitration be equally divided. Whalen Dec., Exh. A, Art. 15. Moreover, unlike the allocation of costs in *Konkar*, Interim Order No. 3 was far more punitive in nature. *Cf. Konkar*, 668 F.Supp. at 274.

In addition, the amount of the daily sanctions imposed—$10,000 per day—does not relate to any provision in the Treaty. Pressed at oral argument, Argonaut's counsel could not point to any specific basis for the level of fine imposed.[9]

Thus, it cannot fairly be said that Interim Order No. 3 "draw[s] its essence" from the Treaty as interpreted in view of FAA policy. *Pacific Reinsurance*, 935 F.2d at 1024. Moreover, the Court finds that the figure of $10,000 per day was arbitrary and appears to have been based on "some body of thought, or feeling, or policy, or law that is outside the contract." *Yasuda*, 37 F.3d at 349.

Accordingly, because there is no basis in either the FAA or the arbitration agreement for the sanctions imposed under Interim Order No. 3, the arbitration panel exceeded its powers in issuing said order.

### III. *CONCLUSION*

For the reasons stated above, the Court denies the petition to disqualify the Umpire, confirms Interim Order No. 2, and vacates Interim Order No. 3. This ruling obviates Argonaut's motion to dismiss or stay proceeding in the alternative.

Certain Underwriters is ordered to comply with Interim Order No. 2 forthwith.

IT IS SO ORDERED.

---

8. Whalen Dec., Exh. A, Art. 15 ("The arbitrators shall consider this Agreement an honorable engagement rather than merely a legal obligation; they are relieved of all judicial formalities and may abstain from following the strict rules of law.").

9. In contrast, had the Treaty specified certain late fees and/or interest, and the sanctions or penalty were derived therefrom or related thereto, an argument could be made that the amount of the fine drew its essence from the contract. Such is not the case here.